Filed 6/10/25  P. v. Murray CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B334698 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA152697) |
| v. | |
| DEONTE LEE MURRAY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Connie R. Quinones, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Jason Tran and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

# INTRODUCTION

Deonte Lee Murray appeals from his judgment of conviction of multiple counts of attempted murder and other crimes arising out of his commission of three separate shootings. The victims of the shootings were an acquaintance of Murray, a man whom Murray mistakenly believed was an undercover law enforcement officer, and two sheriff's deputies who were sitting in their patrol vehicle.  On appeal, Murray argues:  (1) this court should conduct an independent review of sealed transcripts for discoverable material under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); (2) the trial court erred in admitting the preliminary hearing testimony of one of the victims; (3) the prosecution failed to timely disclose certain discovery to the defense; (4) the prosecution committed prejudicial misconduct; (5) there were two instances of prejudicial juror misconduct; (6) Murray was improperly convicted of four separate counts of possession of a firearm by a felon; (7) the sentence imposed on each count of possession of a firearm by a felon should be stayed under Penal Code[1] section 654; and (8) assessments that were not orally pronounced by the trial court must be stricken.

We conclude that two of the four convictions for possession of a firearm by a felon must be reversed because the evidence showed that Murray continuously possessed only two firearms during the period of time covering the crimes in this case. We also conclude that the trial court must impose certain mandatory assessments on remand.  We reject all of Murray's remaining arguments on appeal.  We accordingly reverse the

---

[1]     Unless otherwise stated, all further undesignated statutory references are to the Penal Code.

convictions in counts 9 and 11 and remand for resentencing. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Charges

In an information, the Los Angeles County District Attorney's Office charged Murray with one count of carjacking (§ 215, subd. (a); count 1), one count of second degree robbery (§ 211; count 2), one count of assault with a semiautomatic firearm (§ 245, subd. (b); count 3), three counts of attempted murder (§§ 187, subd. (a), 664; counts 6, 7 & 10), and four counts of possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 5, 8, 9, & 11). The information alleged that the attempted murder offenses in counts 6 and 7 were willful, deliberate, and premeditated, and committed against peace officers engaged in their performance of their duties (§ 664, subds. (e)–(f)). The information also alleged multiple firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subds. (b)–(d)), a great-bodily-injury enhancement (§ 12022.7, subd. (a)), a prior conviction for a serious or violent felony (§§ 667, subds. (a)(1), (d), 1170.12, subd. (b)), and numerous aggravating factors (Cal. Rules of Court, rule 4.421(a)–(b)).

### 2. Prosecution evidence

#### 2.1. Carjacking, robbery, and shooting of Andrew Harris (counts 1–3, 5)

On September 1, 2020, Andrew Harris drove his black Mercedes to Bradford Avenue in the city of Compton, and parked it on the street. After Harris got out of his car, he was approached by a group of men that included Murray, whom Harris had known for years. The men exchanged "fighting words," and Murray threatened to shoot Harris. As Harris

3

started to leave, Murray walked up a driveway and returned with a rifle. Murray told Harris, "Give me what you got." Harris threw his money and keys on the ground. Murray then shot Harris in the leg. After shooting Harris, Murray took his belongings from the ground, got into the Mercedes, and drove away.

During a search of the scene, the police recovered one live round and one expended shell casing from the street. The police also obtained a video recording of the street taken by someone at a nearby residence. The video showed Murray pointing the rifle at Harris, and Harris with a wounded leg after the shooting.

### 2.2. Deputy-involved shooting of Murray's friend

Samuel Herrera was Murray's close friend. On the morning of September 10, 2020, the Los Angeles County Sheriff's Department served a search warrant at Herrera's residence on Bradfield Avenue. During the service of that warrant, deputies fatally shot Herrera outside the garage of his house.

### 2.3. Shooting of Alvaro Rios (counts 10–11)

On the afternoon of September 10, 2020, Alvaro Rios, an employee of a private investigator company, drove a silver Ford Explorer to the Compton courthouse and parked it on a nearby street. After returning from the courthouse, Rios set up a laptop computer inside the car to attend a virtual meeting for his work. While Rios was sitting in the driver's seat, a black Mercedes with chrome trim around the window drove down the street and stopped beside Rios's vehicle. A Black man who was driving the Mercedes pointed a rifle at Rios, fired several shots, and then sped away. Rios was shot in the arm, hand, chest, and abdomen, and suffered serious injuries. Shortly after the shooting, the

4

police found four expended shell casings on the street near Rios's car.

### 2.4. Shooting of deputy sheriffs Claudia Apolinar and Emmanuel Perez-Perez (counts 6–9)

On September 12, 2020, the Los Angeles County Sheriff's deputies Claudia Apolinar and Emmanuel Perez-Perez sat in their patrol car at the Compton train station. A Black man walked up to the patrol car, pulled out a gun, and fired multiple shots at the deputies through the passenger side window of the car. The shooter then ran to a black Mercedes in a parking lot, threw the gun into the car, and drove away. Both deputies were seriously wounded in the shooting. Deputy Apolinar was shot in the face and both arms. Deputy Perez-Perez was shot five times, including in the forehead, arm, and hand.

The police found one fired bullet and five fired cartridge cases at the scene of the shooting. A bullet also was recovered from Deputy Perez-Perez's forearm during surgery. As part of the shooting investigation, the police obtained various surveillance videos of the Compton train station and surrounding areas. In addition to capturing the shooting of the deputies in their patrol car, the video footage showed a black Mercedes with chrome trim pulling into a nearby parking lot shortly before the incident, and then driving away right after the shooting occurred.

A witness who saw the Mercedes leaving the scene of the shooting obtained a partial license plate number for the vehicle. That number partially matched the license plate number of a black Mercedes owned by Cindy Sarmiento. On the morning of September 13, 2020, Sarmiento saw that the rear license plate was missing from her vehicle, and reported the theft to the police. A neighbor's security camera showed an unidentified person

5

taking the license plate from the Mercedes. Sheriff's sergeant Sam Dang, who was conducting surveillance of the Mercedes at that time, observed a Black man remove the rear license plate from the vehicle and then leave the area.

### 2.5. Investigation and arrest of Murray

On September 15, 2020, Murray led multiple officers from the sheriff's department on a high-speed chase while driving a blue Toyota Solara. At some point, Murray abandoned the car in the city of Lynwood and fled on foot. After several hours, the officers found Murray hiding in a chicken coop. He refused to come out until a police dog was released and began to attack him. Murray was then caught and arrested.

During the pursuit of Murray, the police recovered a loaded semiautomatic handgun from a parking lot in Compton. That same day, the police also located Harris's Mercedes, which was parked near an elementary school. Several fired cartridge cases were found in both the Mercedes and the Toyota abandoned by Murray.

A forensic analysis of the spent casings that were found at the scene of each shooting showed that casings recovered from the Harris and Rios shootings were fired from the same firearm as casings recovered from the Mercedes. Additionally, casings recovered from the shooting of the deputies, as well as casings recovered from both the Mercedes and the Toyota, were all fired from the semiautomatic handgun that was found in the Compton parking lot. Murray's DNA was found inside the Mercedes, and on the handgun and its live cartridges.

During the investigation, the police interviewed several people who knew Murray. According to Herrera's brother, Murray admitted to him that he shot the sheriff's deputies for

6

Herrera. Murray told Herrera's brother, "I smoked those motherfuckers. Those fucking pigs." Murray's friend, Kristy Gamble, disclosed that after Herrera was killed, Murray said he was going to "take them . . . motherfuckers out," and made clear that he was going to kill a sheriff's deputy. Murray later told Gamble that he shot the two deputies, and that he "did it for Sam." Both Gamble and Herrera's brother reported that when they saw a video of the shooting on the news, they recognized Murray as the shooter.

In her interview with the police, Jessica Luna stated that she was friends with both Murray and Harris, and that Murray admitted to her that he shot Harris and took his car during an altercation. Luna also stated that Murray was angry at the sheriff's deputies who killed Herrera, and that he believed they lied when they claimed Herrera was armed with a gun and being aggressive. Following Herrera's death, Murray was drinking, using drugs, and not sleeping, and he said he was going to "blow off a cop's head." Murray later told Luna that he "blasted" a detective who was parked outside the Compton courthouse, and he was angry the shooting did not make the news. The day after the shooting of the deputies, Murray showed Luna a video of the incident. Murray bragged about shooting both deputies in their car at close range, but was upset that "those mother[fuckers] didn't die."

Following his arrest, Murray was recorded making statements on the bus that transported him to and from the courthouse. In one recording, Murray repeatedly said, "Fuck the police." He also said, "I hope both them bitches die on the table." In another recording, Murray asserted, "I knew they were coming for me for the carjacking shit," and "I shoulda killed cuz."

Murray further stated: "He told me in the morning Sam got killed. I bust on the police right there. On Alondra and Bradfield. Pop, pop, pop, pop, pop, pop. [Unintelligible]. That was the first one. Then I caught that one over by the courthouse. That was the second one. Then the train station in Compton. (Laughing). Check the scoreboard, I'm up nigga. On Crip. I don't give a fuck. And y'all can't prove it."

3.    **Defense evidence**

Murray testified on his own behalf. According to Murray's testimony, Harris lost his car to Murray in a dice game, and then spread false rumors about him. Murray "put word . . . out on the street" that Harris needed to come see him. When Harris showed up, he argued with Murray and exposed a gun that he was carrying under his shirt. After Harris handed over his car keys, Murray told him to get any belongings he may have left in the car. Murray then grabbed a gun because he felt threatened. Murray admitted he shot Harris in the leg because he "got spooked a little bit," but denied he demanded Harris's car or other property.

Murray considered Herrera to be a "true friend," and he was devastated when he found out that Herrera died. Murray saw a video that Herrera's girlfriend took at the time Herrera was shot by the sheriff's deputies, and Herrera could be heard saying his hands were up and asking why a gun was pointed at his face. Murray admitted he shot Rios on the day that Herrera was killed. About an hour after learning of Herrera's death, Murray drove to the courthouse and shot at Rios's car because he thought it was an undercover sheriff's vehicle. Following that shooting, Murray changed the license plate on the Mercedes by taking the one from Sarmiento's car.

8

Murray also admitted to shooting the deputies two days after Herrera's death. According to Murray, he had not slept for several days because he was using drugs and drinking. Murray was driving around and grieving for Herrera when he shot the deputies. Murray believed that all sheriff's deputies were responsible for Herrera's death, stating, "[T]hey might not have been the one [that] pulled the trigger but they helped cover it up." Murray testified that when he committed the shooting, "I think it was more on impulse. . . . Just reacted from everything that was going on in my mind. . . . No plan, no nothing. Just everything just overwhelmed me."

On cross-examination, Murray admitted that when he shot Rios, he was trying to kill him. He also admitted that when he shot the two deputies, he was trying to take their lives. Murray testified that he believed every sheriff's deputy in the Compton area "was guilty," and that the shooting was "about making them pay."

### 4.    Jury verdict and sentencing

The jury found Murray guilty as charged of the carjacking, second degree robbery, and assault with a semiautomatic firearm of Harris (counts 1, 2, & 3), the attempted murder of Rios (count 10), the attempted willful, deliberate, and premeditated murders of Deputies Apolinar and Perez-Perez (counts 6 & 7), and four counts of possession of a firearm by a felon (counts 5, 8, 9, & 11). The jury made true findings on the firearm enhancements under section 12022.5, subdivision (a), and section 12022.53, subdivision (b), (c), and (d), and on the great-bodily-injury enhancement under section 12022.7, subdivision (a). The jury also found true the allegations that the attempted murders of the deputies were committed against peace officers in the

9

performance of their duties under section 664, subdivisions (e) and (f). In a bifurcated proceeding, Murray admitted that he suffered a prior serious felony conviction under sections 667, subdivision (a)(1), and 1170.12, subdivision (b).

The trial court sentenced Murray to a term of 166 years and eight months to life in state prison. The sentence consisted of three years and four months plus 25 years to life on count 1 for carjacking, consecutive terms of 16 months on counts 5, 8, 9, and 11 for possession of a firearm by a felon, consecutive terms of 55 years to life on counts 6 and 7 for the attempted murders of Deputies Apolinar and Perez-Perez, and a consecutive term of 23 years on count 10 for the attempted murder of Rios. The court stayed the sentences imposed on count 2 for robbery and count 3 for assault with a semiautomatic firearm under section 654.

Murray filed a timely appeal.

## DISCUSSION

### 1. *Pitchess* review

Prior to trial, Murray filed a motion for discovery under *Pitchess*, *supra*, 11 Cal.3d 531 and *Brady v. Maryland* (1963) 373 U.S. 83, seeking evidence of misconduct by 13 sheriff's deputies who were involved in this case. The trial court ordered an in camera hearing on the motion. After conducting an in camera review of the requested materials, the trial court ruled that there were 17 discoverable items to be disclosed to the defense.

On appeal, Murray has requested that we conduct an independent review of the sealed record to determine whether any discoverable material was withheld. We reviewed the sealed record of the proceedings, and conclude the trial court properly

10

exercised its discretion in deciding the material to be disclosed. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.)

**2.      Admission of Harris's prior testimony at trial**

Murray argues the trial court violated his Sixth Amendment right to confront witnesses against him when it admitted Harris's preliminary hearing testimony because the prosecution failed to take reasonable steps to secure Harris's presence at trial.  We conclude the trial court did not err in admitting Harris's preliminary hearing testimony.

**2.1.      Relevant background**

The trial began on July 24, 2023, with several days of jury voir dire.  On August 3, 2023, the prosecution requested a due diligence hearing regarding Harris's availability for trial, noting that multiple teams were looking for Harris but were unable to find him.  The trial court set the due diligence hearing for August 8, 2023.

At the hearing, Deputy District Attorney Maria Ghobada testified that she attempted to serve Harris with a subpoena to appear as a witness in this case on June 22, 2023.  On that date, Harris had a scheduled court appearance at the Norwalk courthouse in another case.  Ghobada waited in court to serve Harris with the subpoena, but he did not appear and a bench warrant was issued for him.

The Los Angeles County Sheriff's detective Steve Blagg testified that he previously served Harris with a subpoena for the preliminary hearing in this case "[a]fter a lot of effort."  To find Harris for that hearing, Blagg obtained a current phone number for him, secured a search warrant to "ping" his cell phone, and then located Harris in his truck in Compton.  Although Harris

11

repeatedly told Blagg at the time that he feared for his safety, he appeared and testified at the preliminary hearing.

In June 2023, shortly after the bench warrant was issued for him, Harris called Blagg and told him that he was afraid of being in custody because of his prior testimony. After several conversations with Blagg where Harris refused to surrender, the phone number that Harris used to contact Blagg was disconnected. Between mid-June and mid-July 2023, Blagg looked for Harris on four to five occasions to serve him with a subpoena for trial, but was unable to find him. Blagg drove by several locations in Compton that Harris was known to frequent, including the home and workplace of Harris's girlfriend. Blagg also created a wanted flyer with Harris's photo, which he distributed to deputies at the Compton and Lakewood sheriff's stations. In addition, Blagg contacted investigators with the district attorney's surveillance team to seek their assistance in locating Harris.

On July 26, 2023, Harris called Blagg from a blocked phone number, and again expressed fear of being in custody due to his prior testimony in this case. Blagg explained that there was an outstanding warrant for his arrest, and that Harris could be placed in protective custody to ensure his safety. After Harris indicated that Blagg was the only person to whom he felt comfortable surrendering, they agreed to meet at the Compton sheriff's station on August 1, 2023, but Harris did not appear. Blagg then called and texted Harris's girlfriend, but received no reply.

As part of the effort to find Harris, Blagg contacted the county morgue and medical examiner's office, but they did not have any record of him. Blagg further confirmed that Harris was

not a patient at any hospital within Los Angeles County. In addition, Blagg sought information on possible locations for Harris from the former sheriff's detective who last arrested Harris in another case. Blagg then shared that information with the district attorney's investigators who were assisting in the search. Blagg also asked Compton patrol deputies and gang detectives to keep a watch out for Harris. Blagg did not write a report documenting these efforts to locate Harris, and instead testified based solely on his memory.

The district attorney investigator Oscar Fernandez testified that he was part of a team of six to seven investigators tasked with locating Harris. On July 26, 2023, the team conducted surveillance of Harris's last known address at a residence in Compton. At that location, the team met with Sandra Garcia, who identified herself as Harris's former girlfriend. Garcia stated that Harris occasionally stayed overnight at that address, but she had not spoken to him for a few weeks and did not have a current phone number for him. She also stated that Harris drove a white Chevy truck. For about two hours, the team monitored the residence and a nearby laundry mat where Garcia worked, but did not find Harris.

On August 2, 2023, a team of six investigators followed Garcia for about an hour to see if she would lead them to Harris, but she did not. When Garcia arrived at the laundry mat, the team again met with her. Garcia stated that Harris called her from a blocked phone number the last time they spoke. She denied knowing where Harris was staying, but identified some streets in the Compton area that he tended to frequent. Based on that information, each team member was assigned a geographic area "to systematically search up and down the streets." They

13

spent about six hours that day looking for Harris, but did not locate him.

On August 7, 2023, Blagg provided the district attorney's investigation team with additional information about Harris's possible location. A team of six investigators then spent about three hours that day searching the area in unmarked vehicles, but they were unable to find Harris. Later that day, Harris called one of the investigators from an untraceable internet number. Harris stated that he had been receiving death threats and that his truck had been stolen.

The trial court found that the prosecution exercised due diligence in attempting to locate Harris, and that Harris was unavailable as a witness. Based on that ruling, the trial court allowed the prosecution to read Harris's preliminary hearing testimony to the jury.

### 2.2. Governing law

A criminal defendant has a right under both the federal and state Constitutions to confront witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) "Although the constitutional right of confrontation is important, it is not absolute. [Citation.] If a witness is unavailable but had previously testified against the defendant and was subject to cross-examination at that time, that prior testimony may be admitted." (*People v. Wilson* (2021) 11 Cal.5th 259, 290.) In *Crawford v. Washington* (2004) 541 U.S. 36, the United States Supreme Court recognized that, under the Sixth Amendment, the "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Crawford v. Washington*, at p. 59.)

14

In California, Evidence Code section 1291 codifies this traditional exception to the right of confrontation. (*People v. Wilson*, *supra*, 11 Cal.5th at p. 290.) It provides, in relevant part, that "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness," and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a).) As our Supreme Court has recognized, "when the requirements of [Evidence Code] section 1291 are met, the admission of former testimony in evidence does not violate [the] constitutional right of confrontation." (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)

Under Evidence Code section 240, a declarant is "unavailable as a witness" if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (*Id.*, subd. (a)(5).) "The term '[r]easonable diligence, often called "due diligence" in case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' " (*People v. Herrera, supra*, 49 Cal.4th at p. 622.) Where the relevant facts are undisputed, we independently review a trial court's determination of due diligence. (*People v. Fuiava* (2012) 53 Cal.4th 622, 675.)

15

## 2.3. The trial court did not err in admitting Harris's preliminary hearing testimony

Murray contends Harris was not an unavailable witness because the prosecution failed to establish that it made timely and reasonable efforts to locate him prior to trial. He specifically claims the prosecution failed to exercise due diligence because it did not begin searching for Harris until July 26, 2023, the third day of trial. The record however, does not support Murray's claim. Rather, the record shows that, on June 22, 2023, about one month before trial began, the prosecution attempted to serve Harris with a subpoena for trial during a scheduled court hearing in another case, but Harris did not appear. Furthermore, at the due diligence hearing, Detective Blagg testified about the repeated efforts that he made to find Harris between mid-June and mid-July 2023. These efforts included driving by several locations that Harris was known to frequent, distributing a flyer with Harris's photograph to deputies at two local sheriff's stations, asking patrol deputies and gang detectives at the Compton station to look out for Harris, and contacting the detective who last arrested Harris for information on his possible whereabouts. Detective Blagg also looked for Harris in the records of the county morgue, medical examiner's office, and local hospitals, but did not locate him.

The record further reflects Detective Blagg sought the assistance of the district attorney's investigators in searching for Harris. A team of six to seven investigators conducted surveillance of Harris's last known address, contacted and followed Harris's girlfriend, and systematically searched the areas that Harris tended to frequent based on the information provided by his girlfriend and Detective Blagg. The team

16

engaged in these search efforts for two hours on July 26, 2023, for six hours on August 2, 2023, and for three hours on August 7, 2023, but none proved to be fruitful. On this record, the prosecution's efforts to find Harris, while not exhaustive, showed reasonable diligence.

Murray asserts the prosecution should have begun searching for Harris earlier in the case given that he was a reluctant witness who repeatedly expressed fear about testifying. Murray also argues the prosecution should have conducted a more extensive search by contacting Harris's other friends and family members, checking additional addresses that he might have frequented, and attempting to locate him through his cell phone. However, as the trial court observed, it appeared that Harris was actively avoiding service because he did not want to testify. In June 2023, after a bench warrant was issued for his arrest, Harris called Detective Blagg to discuss his fear of being harmed in custody based on his prior testimony. He then shut down the service on his cell phone. Although Harris later called Detective Blagg from a blocked phone number and agreed to surrender himself at a designated time and location, he failed to show up for the scheduled meeting. Under these circumstances, it appears unlikely that additional efforts to locate Harris would have been successful, even if such efforts had begun earlier. Moreover, where, as here, the record shows the prosecution exercised reasonable diligence to secure a witness's presence at trial, "the circumstance that 'additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness.' " (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 677.) Because the prosecution exercised

17

reasonable diligence in attempting to find Harris, the trial court did not err in determining that he was an unavailable witness and admitting his preliminary hearing testimony.

**3.      The prosecution's compliance with discovery**

Murray asserts the prosecution violated its discovery obligations by failing to timely disclose information about certain witnesses that it intended to call at trial. We conclude the trial court properly addressed the prosecution's alleged discovery violations, and even if there was error, it was harmless.

**3.1.   Relevant background**

At trial, the prosecution presented testimony from Cindy Sarmiento that the license plate on her black Mercedes was missing, along with her neighbor's surveillance video showing that a Black man removed the license plate on the morning of September 13, 2020. Following the presentation of this evidence, the prosecution sought to call the Los Angeles County Sheriff's sergeant Sam Dang to testify that he was conducting surveillance of Sarmiento's Mercedes that morning, and that he saw an unidentified Black man remove the license plate from the vehicle.

Defense counsel objected to Sergeant Dang's testimony because his name was not listed in any police reports. The prosecutor responded that he recently discovered that Sergeant Dang was the unnamed officer referenced in the police report who observed the removal of Sarmiento's license plate, and that his testimony would be limited to matters contained in the report.

Defense counsel then argued that this was not the first time the prosecution violated its discovery obligations. Defense counsel noted that she was not provided with a rap sheet for Kristy Gamble who previously testified, and that she had to find Gamble's criminal record herself. The prosecutor explained that

18

he offered to delay calling Gamble as a witness when he learned of the failure to provide the rap sheet, but defense counsel declined that offer. Defense counsel clarified that she was still requesting that the prosecutor provide the rap sheet and agree to a stipulation regarding Gamble's criminal record if any new information was discovered. The prosecutor confirmed that he would comply with defense counsel's request.

After questioning the prosecutor about the late disclosure of Sergeant Dang's name to the defense, the trial court ruled that it would allow Sergeant Dang to testify about the specific matters described in the report. The court also stated that it would instruct the jury on the untimely disclosure and asked defense counsel to draft a proposed instruction.

The trial court later gave the jury an instruction entitled "Untimely Disclosure of Evidence." The instruction provided: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the People failed to disclose: [¶] 1. Name of witnesses Sergeant Dang and Kaniewski disclosed during trial. [¶] 2. Report of witness Detective Magana (disclosed August 9, 2023). [¶] 3. Felony convictions/crimes of moral turpitude (Impeachment evidence) for witness Kristy Gamble [¶] [p]rior to trial. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

### 3.2. Governing law

Section 1054.1 requires the prosecution to disclose to the defense certain categories of evidence, including the "names and

addresses of persons the prosecutor intends to call as witnesses at trial," the "existence of a felony conviction of any material witness," and the "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses." (*Id.*, subds. (a), (d) & (f).) " 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered . . . within 30 days of trial. (§ 1054.7.)' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 280.) "Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute, 'including, but not limited to, immediate disclosure, . . . continuance of the matter, or any other lawful order.' (§ 1054.5, subd. (b).) The court may also 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.' " (*Ibid.*) The court may prohibit the testimony of a witness only if all other sanctions have been exhausted. (§ 1054.5, subd. (c).)

We review the trial court's ruling on whether a discovery violation occurred for abuse of discretion. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1105; *People v. Ayala* (2000) 23 Cal.4th 225, 299.) Even where the prosecution fails to comply with its discovery obligations, "[a] violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 []." (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 280.) To demonstrate reversible error, the defendant " 'must establish that " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.' " ' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960.) "To the extent the denial of

20

discovery implicated defendant's federal due process rights [citation], the applicable test is whether the error is harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18 [].)"  (*Id*., at p. 961.)

### 3.3. The trial court properly addressed the prosecution's alleged discovery violations

Murray contends the prosecution's discovery violations necessitate a reversal for a new trial because they unduly prejudiced the defense.  We disagree.  Regarding the late disclosure of Sergeant Dang's name, the trial court properly addressed the discovery violation by limiting the witness's testimony to the observations that were described in the police report, and then instructing the jury on the untimely disclosure.  Moreover, the prosecution's failure to discover Sergeant Dang's identity earlier in the case did not prejudice the defense.  Given the uncontroverted video evidence showing an unidentified Black man removing a license plate from Sarmiento's vehicle, Sergeant Dang's testimony that he witnessed the removal of the license plate was cumulative and not critical to any disputed issue.  With respect to the prosecution's failure to provide Gamble's rap sheet to the defense, this discovery violation was likewise harmless.  On cross-examination, defense counsel elicited testimony from Gamble that she had a number of "theft and drug-related convictions."  Additionally, as requested by defense counsel, the parties later stipulated to all of Gamble's prior convictions for crimes of moral turpitude.

While the jury instruction on the untimely disclosure of evidence also referenced the prosecution's late disclosure of Sergeant Kaniewski's name and Detective Magana's report, the record does not include any discussion in the trial court about

21

these alleged discovery violations.  Even assuming that the prosecution violated its discovery obligations with respect to these two witnesses, Murray has not shown that he suffered any prejudice.  Both Sergeant Kaniewski and Detective Magana testified that they participated in the pursuit of a blue Toyota Solara, but neither officer was present at Murray's subsequent capture or arrest.  Because it was undisputed that Murray led the police on a high-speed chase, any discovery violations related to these witnesses were harmless.

Although Jessica Luna was not included in the instruction on the untimely disclosure of evidence, Murray argues he was prejudiced by the prosecution's delay in providing transcripts of some of Luna's interviews with the police.  The record, however, shows that the prosecutor provided defense counsel with audio recordings of each of Luna's police interviews, including one that took place shortly before the start of trial.  Although defense counsel had the recordings of those interviews transcribed herself, the trial court instructed the prosecutor to provide copies of any transcripts in his possession to ensure that they were consistent with one another.  There is no indication that the prosecutor failed to do so, or that defense counsel raised any further concerns with the trial court about the timeliness of those transcripts.  On this record, Murray has failed to demonstrate that the prosecution's alleged discovery violations resulted in prejudicial error.

## 4.    Prosecutorial misconduct

Murray contends the prosecution committed prejudicial misconduct by harassing him during the trial and improperly injecting sympathy for the victims during closing argument. We conclude this claim lacks merit.

### 4.1. Governing law

" ' " " 'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] . . . A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 943.) " 'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Flores* (2020) 9 Cal.5th 371, 403.)

In addition, "[t]o preserve a claim of prosecutorial misconduct on appeal, ' "[the] defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]" [Citation.] The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 204.)

### 4.2. The prosecution did not commit misconduct

Murray raises two claims of prosecutorial misconduct on appeal. First, he argues the prosecution's investigating officer, Detective Blagg, committed misconduct by winking at him during trial. The record reflects that, early in the trial, Murray told the trial court that Detective Blagg was "taunting" him in the courtroom because he winked at Murray during a lunch break after the jurors left. The court did not ask Detective Blagg whether Murray's allegation was true. Instead, the court simply ordered Detective Blagg to not have any eye contact with Murray.

23

Murray did not raise any further complaints about Detective Blagg's behavior at trial.

Murray's claim of prosecutorial misconduct based on Detective Blagg's conduct fails. Even assuming Detective Blagg winked at Murray during a lunch break, the conduct occurred on single occasion when the jury was not present. Murray has not shown that Detective's Blagg's act of winking at him rendered the trial fundamentally unfair or constituted an improper attempt to persuade the court or the jury. Indeed, because the jury had no knowledge of the incident, it could not have affected the verdict.

Second, Murray asserts the prosecutor committed misconduct during closing argument when he commented to the jury: "And we've been talking about this from the very beginning about you're not here to decide whether or not you like Mr. Murray. You're not. And I'm not going to ask you to like him or dislike him. It's not my place. That's not what we're here about. We're not here about whether you have sympathy for the deputies, sympathy for Alvaro Rios, sympathy for Andrew Harris. It's not about that. This is about did he commit these crimes. Does two plus two equal four. And, of course, it does. Of course, it does. From all of [the] things that we've seen, all of the things that we've heard, of course, it does."

Murray's claim of prosecutorial misconduct based on these comments before the jury likewise fails. Because Murray did not raise any objection to the prosecutor's remarks in the trial court, he forfeited this claim on appeal. Even if not forfeited, however, the claim lacks merit. " 'As a general rule, a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim.' " (*People v. Fayed*, *supra*, 9 Cal.5th at p. 205.) In this case, however, the

24

prosecutor did not improperly appeal to the jury's sympathy for the victims. Rather, the prosecutor told the jury that sympathy for the victims was not relevant because the jury's role was solely to determine whether Murray committed the charged crimes.

Where, as here, " 'a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " ' (*People v. Rivera* (2019) 7 Cal.5th 306, 334.) When considered in context, the prosecutor's isolated remark about sympathy for the victims was not reasonably likely to inflame the jury. Moreover, the trial court instructed the jury that in "closing arguments, the attorneys will discuss the case, but their remarks are not evidence," and that the jury "must not let bias, sympathy, prejudice, or public opinion influence [its] assessment of the evidence or [its] decision." " 'We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Dalton* (2019) 7 Cal.5th 166, 260.) On this record, no prejudicial misconduct occurred.

5.    **Juror misconduct**

Murray argues reversal is required based on two instances of alleged juror misconduct. He specifically asserts that Juror No. 1 was unduly pressured by other jurors during deliberations to reach a verdict, and that Juror No. 8 was biased against him based on a fear for her safety. We conclude Murray has failed to demonstrate that there was juror misconduct in this case.

### 5.1. Juror No. 1
#### 5.1.1. Relevant background

On the last day of jury deliberations, the trial court informed the parties that Juror No. 1 called the court's judicial assistant at the end of the previous day and expressed that she felt "threatened" and "harassed" in the jury room. On the call, the juror said she was frustrated because she was a special education teacher, and after getting home late each day from jury duty, she had to prepare lesson plans for her class while not being paid for that work. She also said the jury "could have been done yesterday . . . but there is one juror that insists on having a verdict, either a not guilty or a guilty." Juror No. 1 wanted the court to instruct the jury that "it's okay to be hung."

Later that morning, Juror No. 1 was brought into the courtroom for questioning. When the trial court asked how she was doing, Juror No. 1 replied, "Better. I think we finally came to an agreement so it's good." She reiterated how jury duty was negatively impacting her work and students. With respect to the deliberations, however, she stated, "I'm better. It's over. So we finally came to an agreement with everybody and I think . . . we've grown close with some people and stuff and I feel like we were able to sort it out together . . . ." When asked whether she was feeling harassed in the jury room and whether it impacted her ability to be fair, Juror No. 1 responded, "No." She then explained, "Honestly, it's personality . . . you bring twelve people from different paths of life and a lot of times the way you talk to people in your immediate circle is not the way you would talk to people you don't know. And I think that that's what's happened where people think they can just talk to you the way they talk to their immediate circle and it's not . . . and we have been together

26

so long." She added, "[W]e're parents, we're employees, and I think it's getting on us, honestly. [¶] So we are just so glad we are on the other end."

After Juror No. 1 left the courtroom, the trial court stated, "I feel comfortable that she was able to effectively deliberate with the jurors and she did not reiterate any of the concerns that she had from yesterday." Defense counsel did not object or raise any concerns about juror misconduct. Shortly after, the jury returned its verdict.

### 5.1.2. Governing law

" 'A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors.' " (*People v. Miles* (2020) 9 Cal.5th 513, 601.) Where a verdict is attacked based on juror misconduct, " 'the focus is on whether there is any overt event or circumstance . . . which suggests a likelihood that one or more members of the jury were influenced by improper bias.' " (*People v. Peoples* (2016) 62 Cal.4th 718, 776, italics omitted.) "Although juror misconduct generally raises a presumption of prejudice, any such presumption is rebutted if a review of the entire record fails to show a 'substantial likelihood that one or more jurors were actually biased against the defendant.' " (*People v. Nadey* (2024) 16 Cal.5th 102, 174–175, italics omitted.) " ' "In determining whether juror misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " ' [Citation.] Whether any such misconduct was prejudicial, however, ' "is a mixed question of law and fact subject to an appellate court's independent determination." ' " (*Id.* at p. 172.)

### 5.1.3. The trial court did not err in finding there was no misconduct involving Juror No. 1

Murray contends prejudicial juror misconduct occurred in this case because other jurors harassed and pressured Juror No. 1 to reach a unanimous verdict. A defendant forfeits a claim of juror misconduct, however, "when defense counsel does not 'propose additional questions [be asked of jurors], object to any juror's continued service, or request a mistrial on the ground of juror misconduct.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1169–1170.) Here, defense counsel did not request that the court ask additional questions of Juror No. 1 or any other members of the jury, nor did counsel raise any objection regarding alleged juror misconduct. Murray thus forfeited this claim on appeal. Even if not forfeited, the claim fails on the merits.

Although Juror No. 1 initially stated in a telephone call to the trial court's judicial assistant that she felt "harassed" and "threatened" during jury deliberations, she did not identify any specific conduct by other jurors that caused her to feel that way. Then, when questioned by the court about these comments, Juror No. 1 explained that "[h]onestly, it's personality . . . you bring twelve people from different paths of life and a lot of times the way you talk to people in your immediate circle is not the way you would talk to people you don't know." While Juror No. 1 acknowledged being frustrated with how her fellow jurors communicated during deliberations, she denied that it impacted her ability to be fair. As our Supreme Court observed, " 'jurors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means.' " (*People v. Thompson* (2010) 49 Cal.4th 79, 141.)

28

Such disagreement, even if heated, does not establish juror misconduct.  (*Ibid*.)

Murray claims there was misconduct because Juror No. 1 was unduly pressured by the other jurors to reach a unanimous verdict rather than have a hung jury.  The record, however, does not support this claim.  When Juror No. 1 spoke with the court's judicial assistant, she conveyed that one of the other jurors wanted to continue deliberating until they reached a verdict of guilty or not guilty.  Juror No. 1 did not suggest that she herself was a holdout juror, or that she felt pressured by her fellow jurors to vote a certain way.  Additionally, when questioned by the court the following day, Juror No. 1 explained that the jury "finally came to an agreement with everybody" that morning, and that they "were able to sort it out together."  There is no indication that Juror No. 1, or any other juror, was improperly coerced to change their vote.  On this record, no misconduct related to Juror No. 1 occurred.

### 5.2.   Juror No. 8
#### 5.2.1. Relevant background

During trial, at the end of a Friday session, the trial court indicated that Juror No. 8 sent a note to the judicial assistant expressing that she felt uncomfortable because Murray's mother "gives aggressive energy."  The court noted that it never observed any inappropriate behavior by Murray's mother, who often sat in the audience.  Defense counsel expressed concern that Juror No. 8's comment about aggressive energy was "code for I don't like Black people," and asked that the juror be removed for bias.

The following Monday, Juror No. 8 was brought into the courtroom for questioning.  In response to the court's inquiry, Juror No. 8 recounted that she was in the hallway outside the

courtroom when she overheard Murray's mother speaking "very aggressively" to the cleaning crew in the nearby restroom and "screaming loudly" because she was not allowed to use the restroom at that time.  Juror No. 8 stated that the incident made her feel "very uncomfortable" because she believed "that when somebody is doing their duties as far as cleaning the restroom, it's not really their fault" and "nobody should be talked to in that way."  She did not tell any other jurors what she heard, but one of them approached her afterward and noted that she looked stressed.  Juror No. 8 also stated that, when she left the courthouse that day, she was "more cautious of [her] surroundings" and did not drive straight home because she was "scared someone [might] follow" her.

The court asked Juror No. 8 if she could set that incident aside and decide the case based on the evidence.  She initially replied, "I can try."  The court reminded Juror No. 8 of its instruction to the jury at the start of trial "that anything that happens in that hallway does not bear on this case."  When the court again asked if she could set the incident aside, Juror No. 8 answered, "Yes."  In response to questioning from defense counsel, Juror No. 8 denied that she was afraid of Murray's mother, that she would render a verdict based on fear, or that she would hold the perceived behavior of his mother against Murray. When asked whether she would be comfortable having someone with her feelings sitting as a juror if she were on trial, Juror No. 8 said, "[P]robably not."  But when asked whether she could be fair if she remained on the jury, Juror No. 8 replied, "Based on the facts, yes."  She then stated, "The only reason why I brought it up is something I was feeling.  I didn't know if it was going to keep going throughout the weekend.  So I just wanted to make

30

sure that whatever I was feeling at the moment was that—
I didn't want to come back today and talk about that. . . . [¶]
Kind of just wanted to forget about it."  In response to further
questioning, Juror No. 8 again stated, "[B]ased on the facts, I can
be fair."

After hearing from counsel, the court denied the request to
discharge Juror No. 8.  The court reasoned:  Juror No. 8
"indicated that she could be fair. [¶] Counsel asked her if
knowing what she knows about her, would she feel comfortable
with her as a juror.  She said, 'Probably not.'  That's all she said.
But when asked directly if she could be fair in this case, she said
she could based on the facts. . . . [¶] . . . [¶] I think she was doing
her duty as reporting anything that happens out in the hallway
to the court.  She's explained what happened . . . .  Nothing
directed at her, nothing directed at the jurors."  The court also
noted that Juror No. 8 "came back today wanting to forget about
what happened on Friday," and that she "said she could be fair
today."

### 5.2.2. Governing law

"Under section 1089, a trial court may discharge a juror
any time during trial, . . . if the court concludes the juror in
question is 'unable to perform his or her duty.' " (*People v.
McGhee* (2025) 17 Cal.5th 612, 627.)  " 'A juror who is actually
biased is unable to perform the duty to fairly deliberate' and is
subject to discharge." (*Id*. at p. 636.)  " 'Actual bias' is 'the
existence of a state of mind on the part of the juror in reference to
the case, or to any of the parties, which will prevent the juror
from acting with entire impartiality, and without prejudice to the
substantial rights of any party.' " (*Ibid*.)  The trial court's
decision on whether to discharge a juror under section 1089 is

31

reviewed for abuse of discretion. (*People v. Lopez* (2018) 5 Cal.5th 339, 365.) " ' "Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged . . . if supported by substantial evidence." ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 943.)

### 5.2.3. The trial court did not err in denying the defense request to discharge Juror No. 8

Murray asserts the trial court abused its discretion in denying his request to remove Juror No. 8 for bias. He argues the incident with his mother affected Juror No. 8's ability to be impartial because she admitted that she would not want herself as a juror and that she was afraid to drive home afterward. We find no abuse of discretion in the trial court's ruling.

As the trial court observed, the incident involving alleged aggressive behavior by Murray's mother was isolated in nature and unrelated to the trial. As described by Juror No. 8, the mother did not direct her behavior at the jurors or anyone else involved in the trial, and her comments did not have anything to do with the case. Although Juror No. 8 expressed that the incident made her uncomfortable at the time, she agreed that she could set it aside and decide the case based on the evidence. She also stated that she did not feel afraid of Murray's mother, and that she would not hold any aggressive conduct by his mother against Murray. Under questioning from defense counsel, Juror No. 8 did state that she "probably" would not want herself as a juror if she were on trial. But in response to further questioning, she made clear that she believed she could be a fair juror if she

remained on the panel and render her verdict based solely on the facts.  On this record, Juror No. 8's inability to perform her duty as a juror was not shown to be a " 'demonstrable reality.' " (*People v. Martinez, supra,* 47 Cal.4th at p. 943.)

Murray contends Juror No. 8 should have been discharged because she admitted that she was afraid to drive straight home after the incident with his mother, fearing she might be followed. Although Juror No. 8 indicated that she was scared that someone would follow her when she left court that day, she clarified that she was not afraid of anyone in particular, and that she drove around for awhile "just to get it out of [her] head."  She also stated that she felt uncomfortable "just at the moment," and that after reporting the incident to the court, she "kind of just wanted to forget about it."  Juror No. 8 did not express that she continued to feel uncomfortable or afraid after returning to court, and she confirmed that she would not render a verdict based on fear. Under these circumstances, the trial court reasonably could find that Juror No. 8 was not biased against Murray.  The court accordingly did not abuse its discretion in denying the request to discharge her.

## 6.    Multiple convictions for possession of a firearm by a felon in counts 9 and 11

Murray contends his convictions for possession of a firearm by a felon in counts 9 and 11 must be reversed because the prosecution did not prove that he continuously possessed more than two firearms when he committed the shootings in this case. The People concede that Murray's convictions in counts 9 and 11 must be reversed.  We agree.

"[P]ossession of a firearm by a felon is a continuing offense."  (*People v. Mason* (2014) 232 Cal.App.4th 355, 365,

33

citing *Wright v. Superior Court* (1997) 15 Cal.4th 521, 525, fn. 1, and *People v. Warren* (1940) 16 Cal.2d 103, 112.) " 'In the case of continuing offenses, only one violation occurs even though the proscribed conduct may extend over [an] indefinite period.' " (*People v. Mason*, at p. 365.) The crime of possession of a firearm by a felon continues for as long as the possession of the firearm continues, and is not completed until the possession has ceased. (*Id*. at pp. 366–367.) Therefore, where there is no evidence that the defendant relinquished his possession of a firearm, or that his possession was interrupted for a given period of time, he can be convicted of only one count of that offense. (*Ibid*.)

Here, Murray was convicted of four counts of possession of a firearm by a felon based on his possession of a firearm when he (1) shot Harris on September 1, 2020 (count 5), (2) shot Rios on September 10, 2020 (count 11), (3) shot Deputies Apolinar and Perez-Perez on September 12, 2020 (count 8), and (4) threw a firearm out of his car as he was fleeing the police on September 15, 2020 (count 9). The prosecution's theory was that Murray used the same .223-caliber rifle to commit the shootings of Harris and Rios, and that the .40-caliber semiautomatic handgun that he used in the shooting of Deputies Apolinar and Perez-Perez was the same handgun that he threw out of his car during the police chase. The prosecution did not present evidence that Murray ceased his possession of the .223-caliber rifle between the Harris and Rios shootings. Nor did the prosecution present evidence that Murray ceased his possession of the .40-caliber handgun between his shooting of the deputies and his disposal of that firearm as he was fleeing the police.

Because the evidence showed that Murray continuously possessed only two firearms—the .223-caliber rifle and the .40-

34

caliber handgun—during the time period covering the crimes in this case, he can only be convicted of two counts of possession of a firearm by a felon. Therefore, the convictions in counts 9 and count 11 must be reversed.

**7. Multiple punishment for possession of a firearm by a felon in counts 5 and 8**

Murray argues the sentences imposed on counts 5, 8, 9, and 11 for possession of a firearm by a felon should have been stayed under section 654. He specifically asserts that section 654 bars multiple punishment for the offense of possession of a firearm by a felon and the primary offense in which the firearm was used. Because we are reversing the convictions in counts 9 and 11 for the reasons addressed above, we limit our analysis of this claim to the counts 5 and 8. We conclude the trial court did not err in imposing separate sentences on each of these counts.

**7.1. Governing law**

Section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (*Id.*, subd. (a).) The statute "bars multiple punishment for separate offenses arising out of a single occurrence when all of the offenses were incident to one objective." (*People v. Cowan* (2010) 50 Cal.4th 401, 498.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507, italics omitted.) A trial court's express or

35

implied determination that two crimes are subject to multiple punishment must be upheld on appeal if supported by substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

As this court recently explained, "[w]hether being a felon in possession of a firearm is a ' " 'divisible transaction from the offense in which [the defendant] employs the weapon depends upon the facts and evidence of each individual case. Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense.' " ' " (*People v. Richardson* (2025) 108 Cal.App.5th 1203, 1214.)

"Generally, section 654 bars multiple punishment where 'the evidence "demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense," ' such as when the defendant obtains a firearm during a struggle that immediately precedes his use of the weapon to assault the victim. [Citation.] On the other hand, multiple punishment is permissible where 'the evidence shows that the defendant possessed the firearm before the crime, with an independent intent.' " (*People v. Richardson*, *supra*, 108 Cal.App.5th at pp. 1214–1215.) Multiple punishment also is allowed where the defendant's possession of the firearm "was not merely simultaneous" with the primary offense, but "continued before, during and after" the commission of that offense. (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1413.)

36

### 7.2. The trial court did not violate section 654 in imposing consecutive sentences for possession of a firearm by a felon in counts 5 and 8

Murray's conviction in count 5 was for unlawful possession of the .223-caliber rifle, which was the firearm that he used to commit the carjacking, robbery, and assault of Harris on September 1, 2020. While the trial court stayed the sentences for the robbery (count 2) and assault (count 3), it imposed consecutive terms for the carjacking (count 1) and possession of a firearm by a felon (count 5). The court also imposed a section 12022.53, subdivision (d) firearm enhancement on the carjacking count. This was permissible under section 654 because the evidence did not show that fortuitous circumstances placed the rifle in Murray's hands at the instant that he carjacked Harris. Rather, Harris testified that after the two men argued on the street, Murray walked up the driveway, retrieved the rifle, and then returned and demanded Harris's property. After Harris dropped his money and car keys on the ground, Murray shot him in the leg and drove off in his Mercedes. Murray also retained possession of the rifle, and used that same firearm to commit the shooting of Rios nine days later. Under these circumstances, the trial court did not err in failing to stay the sentence for the possession of a firearm by a felon in count 5.

Murray's conviction in count 8 was for unlawful possession of the .40-caliber handgun, which was the firearm that he used to commit the shooting of Deputies Apolinar and Perez-Perez on September 12, 2020. The trial court imposed consecutive terms for the attempted murder of Deputy Apolinar (count 6), the attempted murder of Deputy Perez-Perez (count 7), and possession of a firearm by a felon (count 8). The court also

37

imposed a section 12022.53, subdivision (d) enhancement on each attempted murder count.  Section 654 did not preclude multiple punishment for these offenses and enhancements because the evidence showed that Murray was already in possession of the handgun when he arrived at the Compton train station where the deputies were parked.  Indeed, Murray admitted that he was driving around with the gun when he first spotted the deputies' patrol car.  After circling the area, Murray parked the Mercedes, walked over to the patrol car, and then pulled out the gun and repeatedly fired at the two deputies.  Murray did not dispose of the gun until a few days later as the police were chasing him.  On this record, the trial court did not violate section 654 in imposing a separate sentence for the possession of a firearm by a felon in count 8.

## 8.    Imposition of mandatory court assessments

Last, Murray asks us to strike a $30 criminal conviction assessment (Gov. Code, § 70373) and a $40 court operations assessment (§ 1465.8, subd. (a)(1)) from the clerk's minute order because the trial court did not orally impose them at sentencing. The People acknowledge that these assessments were not orally pronounced by the trial court or included in the abstract of judgment, but argue that the abstract of judgment should be modified to reflect the assessments because they are mandatory.

"The oral imposition of sentence constitutes the judgment in an action, and the minutes cannot add anything substantive to the oral pronouncement.  [Citations.]  Generally, the oral pronouncement controls if there is a discrepancy, and the court clerk lacks the authority to add fines or fees not imposed by the trial court.  [Citation.] . . .  '[T]he clerk's minutes must accurately reflect what occurred at the [sentencing] hearing.'  [Citation.]

38

If the clerk includes fines in the court's minutes or the abstract of judgment that were not part of the oral pronouncement of sentence, those fines must be stricken from the minutes and the abstract of judgment." (*People v. Bongani El* (2021) 65 Cal.App.5th 963, 967.)

Here, the trial court was required to impose a $30 criminal conviction assessment under Government Code section 70373, and a $40 court operations assessment under Penal Code section 1465.8, for each of Murray's convictions. (See *People v. Bongani El*, *supra*, 65 Cal.App.5th at p. 967; *People v. Woods* (2010) 191 Cal.App.4th 269, 272.) While the reporter's transcript reflects the trial court did not impose either of these assessments, the clerk's minute order for the sentencing hearing indicates the assessments were imposed but "stayed." Because the matter is being remanded for resentencing, the trial court must impose these assessments on remand. (*People v. Bongani El*, at pp. 967–968.)

## DISPOSITION

The convictions in counts 9 and 11 are reversed and the matter is remanded for resentencing. On remand, the trial court shall resentence Murray on all remaining counts, and shall impose a criminal conviction assessment under Government Code section 70373, and a court operations assessment under Penal Code section 1465.8, for each conviction. Upon resentencing, the trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


VIRAMONTES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.

40